WO IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re )<br>)<br>BILL JOHNSON'S RESTAURANTS, INC., )<br>)<br>Debtor, )<br>_____) <br>)<br>BILL JOHNSON'S RESTAURANTS, INC., )<br>et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>PLATTNER, SCHNEIDMAN, SCHNEIDER, )<br>JEFFRIES & PLATTNER, P.C., et al., )<br>)<br>Defendants. )<br>_____) | No. 2:14-cv-00872-HRH<br><br>Bankruptcy Court<br><br>No. 2:11-bk-22441-PS<br><br>Adversary Proc.<br>No. 2:13-ap-00526-PS |

O R D E R

Cross-motions for Summary Judgment

The Plattner and Harmon defendants move for summary judgment.[1] These motions are opposed.[2] Plaintiffs cross-move for partial summary judgment.[3] Plaintiffs' motion is

---

[1]Docket Nos. 332 and 335 in Adv. Proc. No. 2:13-ap-00526-PS.

[2]Docket Nos. 370 and 371 in Adv. Proc. No. 2:13-ap-00526-PS.

[3]Docket No. 327 in Adv. Proc. No. 2:13-ap-00526-PS.

-1-

opposed.[4] The Plattner defendants also move to exclude the expert testimony of Mark Harrison.[5] The motion to exclude is opposed.[6]

Prior to oral argument on the pending motions, plaintiffs advised the court that they had settled with the Plattner defendants, pending approval of the settlement by the bankruptcy court.[7] Therefore, the Plattner defendants' motion for summary judgment and motion to exclude are denied, with leave to summarily renew these motions in the event the bankruptcy court does not approve plaintiffs' settlement with the Plattner defendants.

The court heard oral argument on the Harmon defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment on May 16, 2017. What follows is the court's disposition of these two motions.

Facts

Plaintiffs are Bill Johnson's Restaurants, Inc. ("BJRI") and the CT Trust. The Harmon defendants are Harmon Dugwyler & Company and Blake Harmon.

For many years, BJRI operated a chain of restaurants in Maricopa County. BJRI was a family-owned and operated company. At all relevant times, the four Johnson siblings, Dena Cameron, Johnny Johnson, Rudy Johnson, and Sherry Novak, were the directors, officers and shareholders of BJRI (referred to herein collectively as the "shareholders").

---

[4]Docket Nos. 353 and 355 in Adv. Proc. No. 2:13-ap-00526-PS.

[5]Docket No. 334 in Adv. Proc. No. 2:13-ap-00526-PS.

[6]Docket No. 369 in Adv. Proc. No. 2:13-ap-00526-PS.

[7]Notice of Partial Settlement [etc.], Docket No. 28.

Dena Cameron also served as the CEO of BJRI until August 2009, when she was replaced by her daughter, Sherry Cameron.

Defendant Blake Harmon was BJRI's accountant from October 31, 1968 until October 31, 2009 and BJRI's auditor from 1968 until 2006. Harmon also did the personal tax returns for the shareholders as well as for Sherry Cameron. Dena Cameron testified that Harmon "was the go-to person for everything.... I don't think I ... ever made a major decision without discussing it with Mr. Harmon."[8]

BJRI was impacted by the recession that began when the housing bubble burst in 2007.[9] BJRI's "[t]otal assets and total equity continuously declined from 2006 to 2009, while total liabilities remained virtually unchanged."[10] In addition, by the end of 2007, BJRI's Defined Benefit Plan (the pension plan) was underfunded by $2,291,725.[11] BJRI also had an outstanding debt of approximately $1.5 million with Chase Bank which had a maturity date of February 23, 2010.[12]

In the 1970's, BJRI's then-shareholders and directors decided to finance life insurance policies for the benefit of the four Johnson siblings. The policies were to act as an incentive

---

[8]Deposition of Harrell Dean Cameron at 20:16-17, Exhibit D, Plaintiff's [sic] Combined Statement of Facts [etc.], Docket No. 372 in Adv. Proc. No. 2:13-ap-00526-PS.

[9]Christopher Linscott Report at 1, Exhibit B, Plaintiff's [sic] Combined Statement of Facts [etc.], Docket No. 372 in Adv. Proc. No. 2:13-ap-00526-PS.

[10]Id. at 2.

[11]Id. at 1.

[12]Id.

for the shareholders' continued, long-term employment with BJRI. In 2008, BJRI's Board of Directors, which was composed of the shareholders, decided to stop financing the life insurance policies. At that time, there were eight policies, two on each sibling, that were funded by BJRI but owned by a separate trust. Plaintiffs contend that the policies were subject to a split-dollar life insurance arrangement that obligated BJRI to pay the premiums on the policies in exchange for a collateral interest in the proceeds of the policy upon the death of the insured in the amount of premiums paid by BJRI during the life of the policy. Plaintiffs contend that the split-dollar agreement also provided that if the agreement were terminated by either the shareholder or BJRI, the shareholder could repay the amount of premiums that BJRI had paid to date and take over ownership of the policy. But, according to plaintiffs, if the shareholder failed to repay the amount of the premiums within 60 days of the termination of the split-dollar agreement, then the shareholder lost any future interest in the policy, and BJRI could liquidate the policy.[13] In 2008, BJRI was paying approximately $100,000 in premiums each year on the shareholders' life insurance policies.

On November 24, 2008, at a special meeting of BJRI's Shareholders and Board of Directors, which was attended by Harmon, the Board authorized BJRI to pay dividends of $382,500 to each of the shareholders (a total of $1,530,000) so that the shareholders could purchase the life insurance policies and take on the responsibility of paying the premiums. The shareholders signed the dividend checks back to BJRI and thus reimbursed BJRI for the

---

[13]Split-Dollar Insurance Agreement, Exhibit Q at 2, Plaintiff's [sic] Combined Statement of Facts [etc.], Docket No. 372 in Adv. Proc. No. 2:13-ap-00526-PS.

premiums that it had paid up to that point in time. Because the shareholders signed the dividend checks back to BJRI, the life insurance transaction was a cashless transaction. At the time of the life insurance transaction, BJRI had a long-term asset on its books of $1,523,630, which represented its collateral interest in the life insurance policies. After the policies were purchased by the shareholders, this asset was removed from BJRI's balance sheet.

Harmon testified that Dena Cameron asked him about the life insurance transaction and that he told her "I thought it would be fair for the company to do that" because it would "[s]ave the company the operating funds they [were] using to pay out for life insurance."[14] Dena Cameron testified that she discussed the life insurance transaction with Harmon and if he had told her that issuing the dividends would be bad for BJRI, the shareholders would have made a different decision.[15]

In 2009, the shareholders decided to transfer the property referred to as Big Apple North to Folks, LLC, a limited liability company that was owned and controlled by the shareholders. The shareholders declared a dividend of $2,058,500, which they then used to purchase the Big Apple North property from BJRI. As with the life insurance transaction,

---

[14]Deposition of Blake Harmon at 70:12-22, Exhibit G, Harmon Dugwyler Defendants' Corrected Separate Statement of Facts [etc.], Docket No. 380 in Adv. Proc No. 2:13-ap-00526-PS.

[15]Dena Cameron Deposition at 43:1-46:1, Exhibit D, Plaintiff's [sic] Combined Statement of Facts [etc.], Docket No. 372 in Adv. Proc. No. 2:13-ap-00526-PS.

this was a cashless transaction. After the sale, the property was leased back to BJRI. BJRI was to pay monthly rent, but BJRI only paid the rent once.

Dena Cameron testified that the shareholders "had talked about doing" this type of transaction "in the past, mostly from a liability standpoint because Bill Johnson's was a C corporation and if you had a problem at one restaurant, you had a problem at five restaurants."[16] She further testified that "it was always our desire to ... have the restaurants kind of under separate entities.... [I]t was just, in my mind, a smarter way of doing business."[17]

Harmon testified that he did not have "anything to do with the creation of Folks [LLC] and the transfer" of the Big Apple North property but if he had thought this transfer were harmful to BJRI, he would have said something to the shareholders.[18] Dena Cameron testified that it was Harmon's idea to issue a dividend so the shareholders could purchase the Big Apple North property.[19]

In August 2011, BJRI filed a petition for bankruptcy and became a debtor in possession. In January 2013, a third-party CEO of BJRI was appointed. The third-party CEO sought permission from the bankruptcy court to hire special counsel to prosecute claims

---

[16]Dena Cameron Deposition at 68:4-10, Exhibit 1, Plattner Defendants' Separate Statement of Facts, Docket No. 340 in Adv. Proc. No. 2:13-ap-00526-PS.

[17]Id. at 68:11-20.

[18]Harmon Deposition at 146:19-25, Exhibit G, Harmon Dugwyler Defendants' Corrected Separate Statement of Facts [etc.], Docket No. 380 in Adv. Proc. No. 2:13-ap-00526-PS.

[19]Dena Cameron Deposition at 67:5-21, Exhibit D, Plaintiff's [sic] Combined Statement of Facts [etc.], Docket No. 372 in Adv. Proc. No. 2:13-ap-00526-PS.

against the shareholders and the Harmon defendants. On April 17, 2013, the bankruptcy court approved the hiring of special counsel. And, on May 3, 2013, plaintiffs commenced this adversary proceeding in bankruptcy court. The referral to the bankruptcy court was withdrawn in January 2017[20] and the matter was transferred to this court.

In their third amended complaint, plaintiffs assert professional malpractice, aiding and abetting, and civil conspiracy claims against the Harmon defendants. Plaintiffs' claims are based on their contention that the 2008 life insurance transaction and the 2009 Folks transaction were undertaken on the advice and counsel of the Harmon defendants and that these transactions rendered BJRI insolvent, which resulted in BJRI filing bankruptcy. Plaintiffs' claim for damages includes the costs incurred in the related bankruptcy proceeding, as well as the amounts currently owed to creditors, including $9.1 million owed to Pension Benefits Guaranty Corporation, which were claims associated with BJRI's underfunded pension plan.

## Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there

---

[20]Docket No. 22.

is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

First, the Harmon defendants have joined in a statute of limitations argument raised by the Plattner defendants.[21] In Arizona, tort claims such as plaintiffs have asserted here are subject to a two-year statute of limitations. A.R.S. § 12-542. "The general rule is that a tort claim accrues when a plaintiff knows, or through the exercise of reasonable diligence should know, of the defendant's wrongful conduct." Taylor v. State Farm Mut. Auto. Ins. Co., 913 P.2d 1092, 1095 (Ariz. 1996).

The Plattner defendants argue that plaintiffs' claims based on the life insurance transaction accrued on or about November 24, 2008 and that plaintiffs' claims based on the Folks transaction accrued in June 2009. The Plattner defendants contend that on the date of these transactions, the shareholders were aware that they were transferring assets from BJRI to themselves because they approved the transactions. The Plattner defendants argue that this

---

[21] Harmon Dugwyler Defendants' Motion for Summary Judgment at 2, n.1, Docket No. 332 in Adv. Proc. No. 2:13-ap-00526-PS.

approval equates to knowledge by BJRI. Thus, the Plattner defendants argue that BJRI knew the basis for plaintiffs' claims on the date of the transactions, both of which took place more than two years before plaintiffs commenced this action.

This argument fails because "the doctrine of adverse domination ... act[s] to toll the statute of limitations." F.D.I.C. v. Jackson, 133 F.3d 694, 698 (9th Cir. 1998). "The doctrine [of adverse domination] tolls the accrual of a cause of action based on the premise that a corporation does not have knowledge of a claim until the wrongdoing directors are no longer in control." USACM Liquidating Trust v. Deloitte & Touche, 754 F.3d 645, 649 (9th Cir. 2014). Although no Arizona court has ever held that the doctrine applies in Arizona, the Ninth Circuit has predicted that the Arizona Supreme Court would so hold. Jackson, 133 F.3d at 698. The causes of actions that plaintiffs are asserting could not have been discovered until the third-party CEO was appointed and could objectively review the conduct of the shareholders and the Harmon defendants. The statute of limitations was tolled until Hartley, the third-party CEO, was appointed in January 2013. Plaintiffs filed their claims in May 2013, which makes plaintiffs' claims timely.

The Harmon defendants next argue that plaintiffs claims are barred by the doctrine of in pari delicto. "The doctrine of in pari delicto dictates that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed in pari delicto, and the law will aid neither, but rather, will leave them where it finds them." Smith ex rel. Estates of Boston Chicken, Inc. v. Arthur Andersen L.L.P., 175 F. Supp. 2d 1180, 1198 (D. Ariz. 2001). However, "where the parties are not

equal in guilt (in pari delicto) but where one of them, although participating in the wrong, is less guilty than the other, the party more at fault cannot employ the doctrine of pari delicto to shield his deliberate invasion of the rights of the former." Brand v. Elledge, 360 P.2d 213, 217 (Ariz. 1961) (citation omitted). The Harmon defendants argue that the doctrine of <u>in pari delicto</u> applies because the conduct of the shareholders can be imputed to BJRI, which means that BJRI participated in the same wrongdoing (the dividend transactions) for which BJRI now seeks to recover.

But contrary to the Harmon defendants' contention, the actions of the shareholders cannot necessarily be imputed to BJRI. If the shareholders, at the time the dividend transactions, "were acting in a manner adverse to the interests of the corporation, the so-called 'adverse interest exception' applies, with the result that the actions of the agents are not imputed to the corporation." In re Crown Vantage, Inc., No. 02-3836 MMC, 2003 WL 25257821, at *7 (N.D. Cal. Sept. 25, 2003). There are questions of fact as to whether the shareholders, at the time of the dividend transactions, were acting in their own best interests as opposed to the best interest of BJRI.

But even assuming that the actions of the shareholders could be imputed to BJRI, there are questions of fact as to whether BJRI and the Harmon defendants are equal in guilt. A reasonable jury could conclude that the shareholders, acting on behalf of BJRI, believed that there would be no harm to BJRI because Harmon approved of the dividend transactions. In other words, a reasonable jury could conclude that BJRI was an innocent party or at least as not guilty as the Harmon defendants. Thus, the Harmon defendants are not entitled to

summary judgment on plaintiffs' claims on the ground that the claims are barred by the doctrine of in pari delicto.

The Harmon defendants next argue that they are entitled to summary judgment on plaintiffs' professional negligence claim. "As in any negligence action, a plaintiff in a [professional] malpractice action must show the following basic elements: duty, breach of duty, causation, and damages." Phillips v. Clancy, 733 P.2d 300, 303 (Ariz. Ct. App. 1986). "Whether the defendant owes the plaintiff a duty of care is a threshold issue; absent some duty, an action for negligence cannot be maintained." Gipson v. Kasey, 150 P.3d 228, 230 (Ariz. 2007). "[W]hether a duty exists, is a matter of law for the court to decide." Id. "Duty is defined as an obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." Id. (citation omitted).

The Harmon defendants argue that Harmon had no duty to BJRI that required him to object to the life insurance and Folks transactions. The Harmon defendants contend that plaintiffs' expert, Christopher Linscott, has opined that Harmon had a duty to 1) object to the dividend transactions because they were discussed in his presence; 2) advise the shareholders as to the possible effects the dividend transactions would have on BJRI, even though he was not asked to do so; and 3) suggest alternative business strategies that the shareholders could have implemented, even though he was not asked to do so. Linscott relied on the American

Institute of CPAs (AICPA) Code of Professional Conduct as the source of these duties.[22] In particular, Linscott cited to the Integrity and Objectivity Rule, which requires an accountant to maintain objectivity and integrity and be free of conflicts of interest when performing any professional service, and the General Standards Rule, which requires an accountant to perform professional services competently and with due care.[23] But, the Harmon defendants argue that plaintiffs have not pointed to a single AICPA rule that would require an accountant to offer unrequested advice.

Linscott has set forth the duties an accountant owes to his client which include duties of integrity, objectivity, competence, and due care.[24] Included in these duties would be a duty to provide guidance to BJRI on financial matters such as the dividend transactions. There are questions of fact as to how much guidance BJRI requested and how much guidance Harmon provided. For example, Dena Cameron testified that she asked Harmon what he thought about the life insurance transaction,[25] yet the Harmon defendants contend that Harmon was not asked about impact that the transaction would have on BJRI. Dena Cameron also testified that it was Harmon's idea to issue a dividend so the shareholders

---

[22]Linscott Report at 16-17, Exhibit B, Harmon Dugwyler Defendants' Corrected Separate Statement of Facts [etc.], Docket No. 380 in Adv. Proc. No. 2:13-ap-00526-PS.

[23]Id.

[24]Id.

[25]Dena Cameron Deposition at 43:1-16, Exhibit D, Plaintiff's [sic] Combined Statement of Facts [etc.], Docket No. 372 in Adv. Proc. No. 2:13-ap-00526-PS.

could purchase the Big Apple North property,[26] but the Harmon defendants contend that Harmon had nothing to do with the Folks dividend transaction. Because there are factual disputes as to Harmon's involvement in the dividend transactions, the court cannot conclude, as a matter of law, that Harmon owed no duty to BJRI in connection with these transactions.

Assuming that Harmon had a duty of care, there are factual disputes as to whether Harmon breached his duty of care. Linscott opines that Harmon breached his duty of care.[27] Tim Tribe, the Harmon defendants' expert, opines that Linscott's opinions are unsupported,[28] which suggests that there was no breach.

But even if there are questions of fact as to whether the Harmon defendants breached their duty of care, which there are, the Harmon defendants argue that they are still entitled to summary judgment on plaintiffs' professional malpractice claim because Harmon's actions did not proximately cause injury to BJRI. In order to prevail on their professional malpractice claim, plaintiffs must establish that the professionals' "breach of duty was a proximate cause of the resulting injury[.]" Standage v. Jaburg & Wilk, P.C., 866 P.2d 889, 894 (Ariz. Ct. App. 1993). In Arizona, proximate causation is defined as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an

---

[26]Id. at 67:5-21.

[27]Linscott Report at 24, Exhibit B, Harmon Dugwyler Defendants' Corrected Separate Statement of Facts [etc.], Docket No. 380 in Adv. Proc. No. 2:13-ap-00526-PS.

[28]Expert Report of Tim D. Tribe at 2, Exhibit E, Harmon Dugwyler Defendants' Corrected Separate Statement of Facts [etc.], Docket No. 380 in Adv. Proc. No. 2:13-ap-00526-PS.

injury, and without which the injury would not have occurred." McDowell v. Davis, 448 P.2d 869, 871 (Ariz. 1968) (citation omitted). "Importantly, for a negligent act to amount to proximate cause, it must be a substantial factor in bringing about the injury." Lazzerini v. Allegiant Air, LLC, Case No. CV–12–01738–PHX–MHB, 2015 WL 3448101, at *7 (D. Ariz. May 28, 2015).

Plaintiffs contend that the two dividend transactions rendered BJRI insolvent, which resulted in BJRI filing bankruptcy. The Harmon defendants dispute that the dividend transactions rendered BJRI insolvent. They contend that the following events, as opposed to the dividend transactions, were substantial contributors to BJRI's financial problems and resulting bankruptcy: 1) the recession of 2008, 2) the failure of BJRI to obtain needed financing because two of the shareholders would not execute personal guarantees, 3) the failure of the shareholders to waive their own pension benefits, 4) the shareholders' failure to obtain a loan secured by BJRI's real estate, and 5) family squabbling.

There are questions of fact as to causation. Factors to consider when

> assessing whether negligent conduct is a substantial factor in producing harm include:
>
>> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>>
>> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

    (c) lapse of time.

Estate of Awsienko v. Tempe St. Luke's Medical Center, LP, Case No. 1 CA–CV 10–0891, 2011 WL 5591587, at *3 (Ariz. Ct. App. Nov. 17, 2011). A reasonable jury, when considering these factors, could conclude that the dividend transactions were a substantial factor in BJRI having to file for bankruptcy.

  In sum, as to plaintiffs' professional negligence claim against the Harmon defendants, there are questions of fact as to whether Harmon owed BJRI a duty in connection with the dividend transactions, whether he breached his duty, and whether that breach was the proximate cause of BJRI's bankruptcy. Because of these factual disputes, the Harmon defendants are not entitled to summary judgment on plaintiffs' professional negligence claim.

  The Harmon defendants also move for summary judgment on plaintiffs' aiding and abetting claim. "For a person to be liable for a tort for aiding and abetting it must be shown that the person knew the primary tortfeasor's conduct constituted a tort, and that the person substantially assisted or encouraged the primary tortfeasor in accomplishing the tort." Dawson v. Withycombe, 163 P.3d 1034, 1052 (Ariz. Ct. App. 2007). Plaintiffs have alleged the following specific torts against the shareholders: 1) breach of fiduciary duty, 2) breach of statutory duty of care under A.R.S. § 10-830, 3) engaging in conflicting interest transactions, 4) defalcation/misappropriation of corporate assets, 4) engaging in fraudulent transfers, and 5) violating the Trust Fund Doctrine. The Harmon defendants argue that there

-15-

is no admissible evidence establishing any of these claims.  The Harmon defendants also argue that there is no evidence that Harmon knew that the shareholders' conduct was wrongful, tortious, or fraudulent.

The evidence of alleged torts by the shareholders is very slim, as is the evidence that the Harmon defendants knew that any alleged torts were being committed by the shareholders. Without substantially more evidence, the court doubts that plaintiffs can establish an aiding and abetting claim against the Harmon defendants.  However, with the record in its present state, the court declines to enter summary judgment for the Harmon defendants on this claim because of the possible inference that the Harmon defendants knew that the shareholders were misappropriating corporate assets.

The Harmon defendants also move for summary judgment on plaintiffs' civil conspiracy claim. "To establish liability on the basis of conspiracy, a plaintiff must show by clear and convincing evidence that the defendant and at least one other person agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means, and accomplish the underlying tort, which in turn caused damages." Dawson, 163 P.3d at 1053. "A conspiracy may be established by circumstantial evidence through the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances." Id.

Plaintiffs' civil conspiracy claim is even more tenuous than plaintiffs' aiding and abetting claim because the burden of proof for a civil conspiracy claim is clear and convincing evidence rather than a preponderance of the evidence.  But, with the record in its present state, the court declines to enter summary judgment for the Harmon defendants on

this claim because of the possible inference that the Harmon defendants joined in an agreement to misappropriate corporate assets.

Finally, the Harmon defendants argue that plaintiffs cannot include in their damages any expenditures that would have incurred if BJRI had stayed in business. See Standard Chartered PLC v. Price Waterhouse, 945 P.2d 317, 347–48 (Ariz. Ct. App. 1996) ("These expenditures were inherent in the underlying transaction and would have been incurred regardless of PW's misrepresentations. Accordingly, they are not recoverable"). The Harmon defendants contend that plaintiffs' damages are largely based on the unpaid claims of creditors, all of which were necessary overhead costs and expenses that would have been incurred even if BJRI had not filed bankruptcy. The Harmon defendants argue that this includes the pension fund claims.

Plaintiffs, however, argue that there is a causal connection between the unpaid creditor claims, including the pension fund claims, and the dividend transactions. Plaintiffs contend that the Harmon defendants are ignoring plaintiffs' contention that it was the dividend transactions that rendered BJRI insolvent. Plaintiffs point out that Linscott has opined that "[h]ad BJR not made large dividend payments in 2008 and 2009 [it] would have been in a better financial position with more options available to [it] to weather the storm."[29] Linscott opined that instead of "draining the [c]ompany of its assets" by declaring over $3.5 million

---

[29]Linscott Report at 20, Exhibit B, Harmon Dugwyler Defendants' Corrected Separate Statement of Facts [etc.], Docket No. 380 in Adv. Proc. No 2:13-ap-00526-PS.

in dividends, "BJR could have used the assets to address [its] looming debts, such as the loan with Chase or the underfunded [pension p]lan."[30]

While BJRI may have had more assets to address its looming debts if the dividends had not been declared, as Linscott opines, that does not change the fact that the creditors' claims represent costs and expenses that would have been incurred regardless of whether BJRI filed bankruptcy or not. The creditors' claims represent expenditures that BJRI would have had to make even if it had not filed bankruptcy or even if the shareholders had not entered into the life insurance and Folks LLC transactions. BJRI would have owed the creditors money even if the two dividend transactions had not taken place. In short, the creditors' claims, including the pension fund claims, cannot be a basis for plaintiffs' damages.

Because the creditors' claims, including the pension fund claims, cannot be a basis for plaintiffs' damages, plaintiffs' motion for partial summary judgment is moot.

## Conclusion

The Plattner defendants' motion for summary judgment and motion to exclude[31] are denied, with leave to summarily renew if the bankruptcy court does approve plaintiffs' settlement with the Plattner defendants.

---

[30]Id. at 21.

[31]Docket Nos. 334 and 335 in Adv. Proc. No. 2:13-ap-00526-PS.

The Harmon defendants' motion for summary judgment[32] is granted in part and denied in part. It is granted as to the issue of whether the creditors' claims can be a component of plaintiffs' damages. Should plaintiffs prevail on any of their claims, their damages may not include the value of the creditors' claims to the extent that these claims represent expenditures that BJRI would have been incurred even if it had not filed bankruptcy. The Harmon defendants' motion for summary judgment is otherwise denied.

Plaintiffs' motion for partial summary judgment[33] is denied.

From its review of the scheduling and planning orders entered by the bankruptcy court prior to the withdrawal of the reference, it is the court's perception that no further development of this case as to the Harmon defendants and plaintiffs is necessary. If either plaintiffs or the Harmon defendants disagree with this assessment, they shall notify the court on or before June 22, 2017.

DATED at Anchorage, Alaska, this 7th day of June, 2017.

/s/ H. Russel Holland
United States District Judge

---

[32]Docket No. 332 in Adv. Proc. No. 2:13-ap-00526-PS.

[33]Docket No. 327 in Adv. Proc. No. 2:13-ap-00526-PS.